IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

JOANNE D. ROBINSON,

Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

No. C12-2024

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.      INTRODUCTION .................................... 2

II.     PRIOR PROCEEDINGS ............................... 2

III.    PRINCIPLES OF REVIEW ............................ 3

IV.     FACTS ........................................... 5
        A.    Robinson's Education and Employment Background ........... 5
        B.    Administrative Hearing Testimony ...................... 6
              1.    Administrative Hearing on October 10, 2006 ............ 6
                    a.    Robinson's Testimony ..................... 6
                    b.    Vocational Expert's Testimony ................ 7
              2.    Administrative Hearing on November 19, 2009 ........... 9
                    a.    Robinson's Testimony ..................... 9
                    b.    Vocational Expert's Testimony ................ 10
        C.    Robinson's Medical History .......................... 11

V.      CONCLUSIONS OF LAW .............................. 18
        A.    ALJ's Disability Determination ........................ 18
        B.    Objections Raised by Claimant ........................ 20
        C.    Reversal or Remand ............................... 25

VI.     CONCLUSION ..................................... 26

VII.    ORDER .......................................... 27

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Joanne D. Robinson on March 20, 2012, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title XVI supplemental security income ("SSI") benefits. Robinson asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide SSI benefits. In the alternative, Robinson requests the Court to remand this matter for further proceedings.

## II. PRIOR PROCEEDINGS

Robinson applied for SSI benefits on April 29, 2004. In her application, Robinson alleged an inability to work since June 10, 2003 due to seizure disorder, narcolepsy, and neck and back problems. Robinson's application was denied on September 13, 2004. On February 1, 2005, Robinson's application was denied on reconsideration. On April 1, 2005, Robinson requested an administrative hearing before an Administrative Law Judge ("ALJ"). On October 10, 2006, Robinson appeared with counsel before ALJ John E. Sandbothe for an administrative hearing. Robinson and vocational expert Carma A. Mitchell testified at the hearing. In a decision dated June 11, 2007, the ALJ denied Robinson's claim. The ALJ determined that Robinson was not disabled and not entitled to SSI benefits because she was functionally capable of performing other work that exists in significant numbers in the national economy. Robinson appealed the ALJ's decision. On December 28, 2007, the Appeals Council denied Robinson's request for review. Consequently, the ALJ's June 11, 2007 decision was adopted as the Commissioner's final decision.

On February 19, 2008, Robinson filed an action for judicial review in the Northern District of Iowa. *See* case number 6:08-cv-2012-JSS. The Commissioner filed an answer on May 7, 2008. On February 18, 2009, the Court entered a ruling reversing and

remanding the action for further proceedings, requiring the ALJ to fully and fairly develop the record. *See* docket number 20, in case number 6:08-cv-2012-JSS.

On November 19, 2009, Robinson appeared with counsel, via video conference, before ALJ John E. Sandbothe, for an administrative hearing on remand. Robinson and vocational expert Roger F. Marquardt testified at the hearing. In a decision dated December 22, 2009, the ALJ denied Robinson's claim. The ALJ determined that Robinson was not disabled; and therefore, not entitled to SSI benefits because she was functionally capable of performing work that existed in significant numbers in the national economy. Robinson appealed the ALJ's decision. On January 24, 2012, the Appeals Council denied Robinson's request for review. Consequently, the ALJ's December 22, 2009 decision was adopted as the Commissioner's final decision.

On March 20, 2012, Robinson filed this action for judicial review. The Commissioner filed an answer on June 27, 2012. On August 1, 2012, Robinson filed a brief arguing there is not substantial evidence in the record to support the ALJ's finding that she was not disabled and that there was other work that exists in significant numbers in the national economy that she could perform. On September 26, 2012, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On October 4, 2012, Robinson filed a reply brief. On May 17, 2012, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III.  PRINCIPLES OF REVIEW

Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for

a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's

4

decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id*. Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Robinson's Education and Employment Background

Robinson was born in 1964. She graduated from high school in 1983. The record contains a detailed earnings report for Robinson. The report covers Robinson's employment from 1985 to 2005. At no time during that period did Robinson earn more than $6,638.82. She had no earnings in 1990, 1991, 1993, 1996, 1998, 2004, and 2005. At the first administrative hearing, the ALJ noted that: "I find [Robinson] doesn't have enough earnings to actually have any past relevant work."[1] At the second administrative hearing, Robinson stated that she had not worked since her first administrative hearing in 2006.[2]

---

[1] Administrative Record at 646.

[2] *Id*. at 956.

### B. Administrative Hearing Testimony

#### 1. Administrative Hearing on October 10, 2006

##### a. Robinson's Testimony

At the administrative hearing, Robinson's attorney asked Robinson what would prevent her from working an eight-hour per day job. Robinson answered that she didn't believe she had the energy or strength needed to perform an eight-hour per day job. She also stated that she was afraid she would hurt herself due to her problems with seizures and narcolepsy.

The ALJ also questioned Robinson about her physical problems:

Q: Have you had carpal tunnel surgery?
A: Yes.
Q: Both hands?
A: Yes. . . .
Q: Do you still have any residual problems with using your hands?
A: Yes.
Q: How so?
A: They're very, they're very weak and there's no strength in it, you know.
Q: Can you still use a keyboard or open a door, turn a key?
A: I can peck.
Q: Hold a pencil?
A: Yeah, I can hold a pencil.
Q: Pick up change?
A: Yeah, it's just anything from a coffee cup up.
Q: Okay. You indicated you very rarely have the, the larger seizures, the grand mals once a month now you say, is that correct?
A: Yeah, as long as I'm taking care of myself. . . .
Q: [How long d]o those normally last you?
A: I know it goes real fast. One, two, three and I'll be out of it for a while.
Q: How long is a while?
A: I just sleeps it off. . . .

| Q: | How long before you can actually get back to a normal routine? |
|---|---|
| A: | Probably the next, the middle of the next day. |
| Q: | So it takes you 24 hours to recoup? |
| A: | Yeah. I know when I'm okay when I can say my name. |
| Q: | Are you still on Ritalin for your narcolepsy? |
| A: | Yeah. |
| Q: | Is it helping? |
| A: | Yeah, I guess. Yeah. |

(Administrative Record at 661-63.)  The ALJ also asked Robinson to describe her typical

day.  According to Robinson, she wakes up in the morning when her children leave for

school, eats breakfast, and does a little cleaning and picking up around the house.  She

does not cook or vacuum.  She testified that she could lift a little more than a gallon of

milk (about ten pounds), and could sit or stand at one time for about 30 minutes.  Lastly,

the ALJ asked:

| Q: | So what do you do to entertain yourself through the day? |
|---|---|
| A: | Nothing. |
| Q: | Read, knit, watch TV? |
| A: | Nope. |
| Q: | Walk the dog? |
| A: | TV will put me to, I wish I had a dog.  TV will put me to sleep and reading will put me to sleep.  I just, I've just, I'm just boring. |

(Administrative Record at 666.)

### b.   *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Carma Mitchell with the

following hypothetical of an individual who can:

> lift 20 pounds occasionally, 10 pounds frequently.  She can
> only occasionally balance, stoop, crouch, kneel, crawl or
> climb; no repetitive reaching.  She can not tolerate extremes
> of heat, cold, humidity, dust, or fumes; no hazards; no
> driving; simple, routine, repetitive work; only occasional
> contact with the public; regular pace.

(Administrative Record at 673.)  In response to this hypothetical, the vocational expert

asked the ALJ:

> VE:  Okay.  Just to clarify, can the person frequently reach like if it's out in front of them as far as like to pick up items and put things on them or --
>
> ALJ:  It just says no repetitive, so they can do it occasionally. They just can't be doing it like on a factory line.
>
> VE:  Okay.
>
> ALJ:  That's that was the limitation they gave, that the DDS gave her.
>
> VE:  Okay.  With my understanding of these limitations yes, there would be jobs that a person can do.  Let me look up, let's see.  I need to check a couple of things here.
>
> ALJ:  Okay.
>
> VE:  Okay.  Well, a majority of these jobs that I'm looking up all seem to have, you know, frequent reach is included.
>
> ALJ:  Uh-huh.
>
> VE:  Even for like mail clerk, inserting machine operator, you know, photocopy machine operator, marker. . . .
>
> ALJ:  She's more of a sedentary job?
>
> VE:  Well, not so much even that.  Even the sedentary jobs like a dresser and document preparer, like , all the operator[.] . . .  Those all require frequent reach as well.
>
> ALJ:  Well, let me look up exactly, I'll tell you exactly the limit they gave her.  Okay, it says overhead reaching is too, is limited to occasional.

(Administrative Record at 674-75.)  The vocational expert testified that under such

limitations, Robinson could perform the following jobs:  (1) machine operator/inserting

machine operator (200 positions in Iowa and 16,000 positions in the nation), (2) marker

(2,200 positions in Iowa and 177,000 positions in the nation), and (3) light sales attendant

(1,900 positions in Iowa and 183,000 positions in the nation).

The ALJ presented the vocational expert with a second hypothetical:

> Same vocational and medical background as before; same limitations as before; however, add she's going to require two

or more unscheduled absences, two or more unscheduled
breaks per day, slow pace for 1/3 of the day, not every day but
many days.

(Administrative Record at 675.) The vocational expert testified that under such limitations,

Robinson could not perform any competitive full-time work.

### 2. *Administrative Hearing on November 19, 2009*

### a. *Robinson's Testimony*

At the second administrative hearing, Robinson's attorney inquired whether

Robinson continued to have difficulty with seizures. Robinson answered that she had a

seizure about once per month. She indicated that some of the seizures were grand mal

seizures and others were "little" ones. Robinson's attorney also asked Robinson to discuss

her difficulties with neck problems:

> Q:   Okay. I know you had neck surgery back in '04. Are
> you recovered from that or do you still have problems
> with your neck?
>
> A:   It's just bending and bending and the muscles are weak
> in it. I can pinch it. I still -- they said the feeling
> might come back, you know.
>
> Q:   Well, do you have trouble doing things in front of you
> then? I mean is it hard for you to --
>
> A:   No, just bending over and doing some lifting and, like
> I say, when I'm laying down, in order for me to get up,
> I got to grab a hold to the wall and push myself up. I
> can't just sit straight up --
>
> . . .
>
> Q:   Do you have pain in your neck at all?
>
> A:   Mostly in my lower shoulders. I know it's probably
> coming from my neck, probably coming from this just
> like the upper shoulders up here. . . .
>
> Q:   The back of your neck, is that sore?
>
> A:   It just stays tender.

(Administrative Record at 962-63.) Robinson's attorney also inquired about Robinson's

ability to walk. Robinson stated that she can walk about one or two blocks before her legs

start to hurt. Robinson further testified that her hands were weak and she had difficulty lifting her 10 pound grandchild. She also stated that she uses an inhaler for problems with asthma. Lastly, Robinson's attorney asked Robinson whether she could work a 40 hour workweek in her current condition. Robinson responded that she could not work full-time because of physical limitations, including standing and lifting.

### b. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Roger F. Marquardt with the following hypothetical for an individual who is able to:

> lift 20 pounds occasionally; ten pounds frequently; she could only occasionally balance, stoop, couch [sic], kneel, crawl, or climb; no overhead reaching; no extremes of heat, cold, humidity, dust, or fumes; no driving; no hazards; simple routine repetitive; only occasional superficial contact with the public; and regular pace. Actually, let's not say occasional superficial; let's just say superficial contact with the public.

(Administrative Record at 972.) The vocational expert testified that under such limitations, Robinson could perform the following jobs: (1) addresser or marker (470 positions in Iowa and 80,000 positions in the nation), (2) checker or sorter (700 positions in Iowa and 73,000 positions in the nation), and (3) office helper (800 positions in Iowa and 96,000 positions in the nation). The ALJ provided the vocational expert with a second hypothetical which was identical to the first hypothetical, except that the individual would "have two or more absences per month. She may have as many as two or more unscheduled breaks per day and a slow pace for many of the days when she is there, for at least a third of the day." The vocational expert testified that under such limitations, Robinson would be precluded from competitive full-time work.

### C. Robinson's Medical History

On April 29, 1998, Robinson underwent an endoscopic right carpal tunnel release to alleviate pain and numbness in her right hand. On June 1, 1998, Robinson had a post-operative follow-up appointment with Dr. Thomas F. Varecka, M.D. Upon examination, Dr. Varecka indicated that Robinson's "preoperative symptoms are just about completely resolved with only minimal discomfort through the proximal right palm."[3] On July 8, 1998, Dr. Varecka performed another endoscopic carpal tunnel release on Robinson's left hand. On July 13, 1998, Dr. Varecka indicated that Robinson's pre-operative symptoms were resolving.

On August 12, 1999, Dr. Jan Hunter, D.O., reviewed Robinson's medical records for Disability Determination Services ("DDS") and provided DDS with a residual functional capacity ("RFC") assessment. Dr. Hunter determined that Robinson had: (1) no exertional limitations, (2) no postural limitations, except to avoid climbing ladders, ropes, and scaffolds due to her seizure disorder, (3) no manipulative limitations, (4) no visual limitations, (5) no communicative limitations, and (6) no environmental limitations, except avoidance of hazards due to her seizure disorder. Dr. Hunter summarized Robinson's medical history as follows:

> [Robinson] was admitted to the hospital for a possible first time seizure on 1/6/98. The day prior she alleged experiencing several unusual episodes. She got to up [sic] prepare herself for dinner, took one step, then fell onto her knee. She later perceived heaviness in her head as well as lightheadedness, visual darkening and facial flushing. Neurological exam was non-focal. EEG was entirely normal. MRI of the head was unremarkable. She was evaluated in 11/98 by Dr. Choy [sic] whose assessment was possible generalized seizure disorder. . . . She was then admitted in 5/99 with a seizure disorder. She had been previously prescribed Dilantin but at this time admitted she had not been taking her Dilantin. . . . Tox screen was positive for cocaine.

---

[3] Administrative Record at 355.

> A review of [Robinson's] seizure disorder questionnaire dated June 25, 1999 reveals that her seizures last approximately 3 to 5 minutes. Following a seizure, she falls asleep. It is stated that [Robinson] takes Dilantin 100 mg three times a day and does this currently on a regular basis. When asked how often her seizures occurred, [Robinson] claims one to two times a month. . . .

(Administrative Record at 427.) Dr. Hunter concluded that "[g]iving full benefit of the doubt to [Robinson] and acknowledging the existence of a discrete seizure disorder, the preponderance of medical evidence in this case supports restrictions as outlined in the RFC assessment provided herein."[4]

In February and March 2001, Dr. Robert H. Choi, M.D., Ph.D., conducted several tests on Robinson, including an EEG and a multiple sleep latency test. The results of the EEG were abnormal and showed the "presence of epileptogenic discharges over the right temporal head region suggestive of a focal seizure disorder."[5] The multiple sleep latency test was also abnormal. The study showed four early appearances of REM sleep. According to Dr. Choi, the REM sleep finding was consistent with a diagnosis of narcolepsy. Dr. Choi treated Robinson's seizure disorder with Depakote, and her narcolepsy with Ritalin.

On June 28, 2001, Dr. Gary J. Cromer, M.D., reviewed Robinson's medical records and provided DDS with a RFC assessment. Dr. Cromer determined that Robinson had no exertional limitations, postural limitations, manipulative limitations, visual limitations, or communicative limitations. Dr. Cromer also found no environmental limitations, except avoidance of hazards. Dr. Cromer concluded that Robinson had:

> documented medically determinable impairments with seizure disorder and narcolepsy, both under reasonably good control

---

[4] Administrative Record at 427.

[5] *Id.* at 607.

with medication. . . . Subjective reports are inconsistent with the medical evidence in that [Robinson's] report to DDSB [sic] is more severe than symptoms she reports to her treating physician, she has not maintained therapeutic anticonvulsant blood levels, and her ongoing illicit drug abuse/dependence would distort her perceptions of pain. These inconsistencies have severely eroded [Robinson's] credibility.

(Administrative Record at 437.)

On February 25, 2004, Robinson met with Esther Bahlmann, ARNP, complaining of cramping in her neck that advanced to pain down her right arm. Bahlmann noted that "[l]eaning over to pick up something aggravates [Robinson's] pain. Moving her head and neck [also] aggravates the pain."[6] Upon examination, Bahlmann found that Robinson's cervical spine at C6 and C7 were tender to palpation. Bahlmann also found that the paraspinous muscles in her cervical spine and her trapezius were tender to palpation. Bahlmann recommended heat and rest as treatment for Robinson's neck pain. Bahlmann also suggesting using Flexeril and Tylenol as treatment. On February 29, 2004, a CT of Robinson's cervical spine revealed a C5-C6 level right lateral/posterolateral disc herniation. Dr. John Halloran, M.D., noted that the "protruding disc volume is large and it fills the proximal aspect of the right neural foramen and compresses the right lateral aspect of the spinal cord."[7]

On March 3, 2004, Robinson presented at the Allen Memorial Hospital emergency room in Waterloo, Iowa, complaining of severe neck pain. A spiral CT of Robinson's cervical spine showed a disc herniation at C5-C6. She was admitted to the hospital, and on March 5, 2004, she underwent a discectomy and fusion at the C5-C6 area of her spine. She was discharged on March 6, 2004. On April 6, 2004, Robinson had a follow-up appointment with Anne Cook, P.A. Robinson informed Cook that following the operation,

---

[6] Administrative Record at 497.

[7] *Id.* at 469.

her pain decreased significantly. She also indicated that her strength had improved. On June 3, 2004, Robinson had another follow-up appointment with Cook. Cook noted that Robinson was "doing well" following her discectomy and fusion in March 2004.

On August 18, 2004, Robinson met with Dr. Usha Anand, M.D., for a disability evaluation. Dr. Anand reviewed Robinson's medical history. Dr. Anand noted that Robinson had a history of seizure disorder:

> [Robinson] has had seizures for about the last seven years. . . .
> Initially, [Robinson] used to have seizures about once a week
> and currently has been having seizures about once a month.
> The seizures are usually grand mal, involves all extremities.
> She is on seizure medications and usually gets her levels
> checked periodically. She has had multiple seizures at work
> in the past and has lost multiple jobs secondary to the
> seizures. . . .
>
> [Robinson] states that she has been diagnosed with narcolepsy
> about four years back. She states that is the biggest problem
> why she is unable to work. She usually dozes off to sleepy
> when just sitting, waiting for appointments or watching TV.
> She falls asleep at multiple times and usually they are short
> naps. She is currently taking Ritalin once a day and she does
> not feel that it really helps with her narcolepsy. . . . She feels
> the narcolepsy has affected her lifestyle that she cannot really
> participate in any entertaining activities. . . .
>
> [Robinson] complains of severe neck pain throughout the
> day. . . . She feels that the pain actually got worse after this
> surgery. The neck pain seems to get worse even with slight
> turning or twisting of her neck; on bending; turning, lying
> down in a wrong way exacerbates the pain. She usually has
> [a] hard time cooking or doing the laundry secondary to the
> neck pain, as she is unable to bend. . . . She has tried physical
> therapy, which has not really helped. She has the pain
> throughout the day, and rates it at about 8/10 most of the day
> and gets worse with any type of movements. . . .
>
> [Robinson has c]hronic left shoulder as well as lower back
> pain. Her left shoulder pain seems to be mostly secondary to

> the severe neck pain. The neck pain seems to radiate down her right and left shoulders into her fingers. She also complains of lower back pain, which is chronic and seems to get worse with sitting for prolonged duration of time. Also, complains of inability to stoop, crawl or climb stairs secondary to the lower back pain.

(Administrative Record at 480-81.) After examining her, Dr. Anand determined that Robinson's seizure disorder and narcolepsy would make it difficult for her to drive. Dr. Anand opined that Robinson's chronic neck pain would prevent her from doing activities that involve bending her head, such as typing, writing, climbing stairs, washing dishes, or doing laundry. Lastly, Dr. Anand noted that Robinson's low back pain made it difficult for her to sit or stand for long durations of time or walk for long distances. Dr. Anand determined that she could walk for about 2.5 blocks at one time.

On September 10, 2004, Dr. J.D. Wilson, M.D., reviewed Robinson's medical records and provided DDS with a RFC assessment. Dr. Wilson determined that Robinson could: (1) occasionally lift and/or carry 20 pounds, (2) frequently carry and/or lift 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Wilson also determined that Robinson could occasionally climb, stoop, kneel, crouch, crawl, and never balance. Dr. Wilson further determined that Robinson was limited in her ability to reach in all directions. Specifically, Dr. Wilson opined that "[Robinson] has decreased [range of motion] of the neck and both shoulders. Overhead reaching is limited to occasional bilaterally."[8] Dr. Wilson found no visual or communicative limitations for Robinson. Lastly, Dr. Wilson determined that Robinson should avoid concentrated exposure to extreme cold, wetness, and fumes, odors, dusts, gases, and poor ventilation, and should avoid even moderate exposure to hazards.

---

[8] Administrative Record at 617.

On November 9, 2004, Robinson visited Dr. Choi for a neurology examination. Dr. Choi noted that Robinson was "doing well" and had not "had any seizures other than one spell a couple months ago[.] . . ."[9] Dr. Choi also noted that Robinson's narcolepsy was controlled by Ritalin.  Dr. Choi further found that Robinson's neurological examination was normal.

On November 19, 2004, Dr. Choi filled out a "Seizures Residual Functional Capacity Questionnaire" provided to him by Robinson's attorney.  Dr. Choi diagnosed Robinson with generalized tonic clonic seizure disorder and narcolepsy.  Dr. Choi indicated that Robinson had seizures every two months, lasting for three to four minutes at a time.[10] Dr. Choi noted that stress, not eating properly, and not taking her medications were precipitating factors for Robinson's seizures.  Dr. Choi further noted that her postictal manifestations were confusion, exhaustion, severe headache, muscle strain, and paranoia.  Dr. Choi found that Robinson had to sleep all day following a seizure.  Thus, Dr. Choi opined that Robinson would miss a day or two of work every one to two months due to her seizure disorder.  Lastly, Dr. Choi noted that Robinson's seizures: (1) would not disrupt the work of co-workers; (2) would not require that she needed more supervision at work than an unimpaired co-worker; (3) would not allow her to work at heights; (4) would not allow her to work with power machines, and (5) would not allow her to drive a car alone.

On August 30, 2005, Robinson met with Dr. Choi for a follow-up appointment regarding her seizure disorder.  Dr. Choi indicated that Robinson's symptoms were controlled by medication.  Dr. Choi also found that Robinson's neurological examination was "normal."  Dr. Choi recommended that Robinson continue her medication as treatment.

---

[9] *Id.* at 576.

[10] Dr. Choi noted that Robinson's last three seizures were on 9/23/2004, 7/16/2004, and May 2004. *See* Administrative Record at 572.

On October 27, 2006, Robinson met with Bahlmann for her annual exam. Bahlmann noted that Robinson was having difficulty with chronic low back pain, and continued to suffer from bilateral arm pain. Bahlmann's notes state that Robinson's "arms always seem uncomfortable to her."[11]   Bahlmann recommended physical therapy, exercise, and the use of wrist splints as treatment. At her next annual exam in November 2007, Robinson continued to complain of low back pain and swelling in her knees. Bahlmann recommended daily exercise and specific knee exercises as treatment.

In April 2009, Robinson met with Bahlmann as part of a homeless program, as she no longer had insurance and lived in section 8 housing. Robinson was seeking medication for her seizure disorder. Bahlmann noted that Robinson had not had as seizure for several months, and indicated that Robinson "does well if she, as she states, takes at least some [anti-seizure medication] everyday."[12] Bahlmann gave Robinson a prescription for anti-seizure medication as treatment.

On July 27, 2009, following a trip to the emergency room for a persistent headache, Robinson again met with Bahlmann for a follow-up appointment. Bahlmann described the recent events as follows:

> [Robinson was] seen in ER recently for headache that had been going on for three weeks.   In the ER she describes experiencing a seizure of some sort. Her ER workup included a CT scan that was negative. At the time, she had not taken her [seizure medication] for some four days because of not being able to tolerate it; this had something to do with her headache.   The headache responded to IV medication; she went home and has not had a return of headache.

(Administrative Record at 763.) Bahlmann recommended continued use of medication as treatment.

---

[11] Administrative Record at 792.

[12] *Id*. at 766.

## V.  CONCLUSIONS OF LAW

### A.  ALJ's Disability Determination

The ALJ determined that Robinson is not disabled.  In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations.  *See* 20 C.F.R. § 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007).  The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 416.920(a)-(g).  "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled."  *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity.  If so, the claimant is not disabled.  Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months.  Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments.  If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled.  However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work.  If so, the

18

>claimant is not disabled. Fifth, the ALJ determines whether
>the claimant can perform other jobs in the economy. If so, the
>claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 416.945.

The ALJ applied the first step of the analysis and determined that Robinson had not engaged in substantial gainful activity since April 29, 2004. At the second step, the ALJ concluded from the medical evidence that Robinson had the following severe impairments: epilepsy, narcolepsy, asthma, status post laminectomy of the cervical spine, obesity, status post carpal tunnel release, and a history of substance abuse. At the third step, the ALJ found that Robinson did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Robinson's RFC as follows:

>[Robinson] has the residual functional capacity to perform light
>work . . . in that [Robinson] is capable of carrying/lifting
>twenty pounds occasionally and ten pounds frequently, and can
>occasionally balance, stoop, crouch, kneel, climb and crawl.

> [Robinson] should avoid reaching overhead, avoid extremes of
> heat, cold, humidity, dust, and fumes, and avoid hazards or
> driving.   [Robinson] can perform only simple, routine,
> repetitive work at a regular pace with only superficial contact
> with the general public.

(Administrative Record at 7T.) Also at the fourth step, the ALJ determined that Robinson had no past relevant work.  At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Robinson could work at jobs that exist in significant numbers in the national economy.  Therefore, the ALJ concluded that Robinson was not disabled.

### B.  Objections Raised by Claimant

Robinson argues that the ALJ failed to properly evaluate the opinions of her consultative examiner, Dr. Anand.  Specifically, Robinson argues that the ALJ's reasons for discounting Dr. Anand's opinions are not supported by substantial evidence on the record.  Moreover, Robinson contends that the ALJ failed to follow the directions of this Court on remand, and failed to explain his reasons for accepting or rejecting Dr. Anand's opinions, in particular as Dr. Anand's opinions relate to her claim of disability.  Robinson also argues that on remand, the ALJ failed to fully and fairly develop the record by not ordering an updated consultative examination. Robinson concludes that the ALJ's failure to properly consider the opinions of Dr. Anand and order a new consultative examination was error.

An ALJ is required to evaluate every medical opinion he or she receives from a claimant.  20 C.F.R. § 416.927(c).  If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion:   "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors."  *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(d)).   "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians.  The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the

government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Furthermore, when an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697(citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)). In considering a physician's RFC assessment, an ALJ is not required to give controlling weight to the physician's assessment if it is inconsistent with other substantial evidence in the record. *Strongson*, 361 F.3d at 1070; *see also Wagner*, 499 F.3d at 848 (In considering medical evidence, an ALJ may "'reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.' *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)."); *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"). "If the RFC assessment

conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Social Security Ruling, 96-8p (July 2, 1996).

Additionally, an ALJ may order medical examinations and tests when the medical records presented to him or her constitute insufficient medical evidence to determine whether the claimant is disabled. *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994) (citation omitted); *see also* 20 C.F.R. § 416.919a(a) ("If we cannot get the information we need from your medical sources, we may decide to purchase a consultative examination."). 20 C.F.R. § 404.1519a(b) provides that "[a] consultative examination [may be purchased] to try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision on your claim." *Id*. For example, a consultative examination should be purchased when "[t]he additional evidence needed is not contained in the records of your medical sources." 20 C.F.R. § 404.1519a(b)(1).

Lastly, the ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)).

On remand, the ALJ was directed to "provide clear reasons for accepting or rejecting Dr. Anand's opinions and support his reasons with evidence from the record, particularly with regard to Robinson's RFC."[13] In his decision, the ALJ reviewed Dr. Anand's recitation of Robinson's medical history, but failed to address Dr. Anand's opinions regarding Robinson's functional abilities or limitations.[14] Specifically, the ALJ

---

[13] Administrative Record at 707; *see also* docket number 20 at 17, in case number 6:08-cv-2012-JSS.

[14] *Compare* Administrative Record at 7V (ALJ's decision) with 480-82
(continued...)

22

offers no discussion of Dr. Anand's determination that:  (1) Robinson's seizure disorder and narcolepsy would make it difficult for her to drive; (2) Robinson's chronic neck pain would prevent her from doing activities that involve bending her head, such as typing, writing, climbing stairs, washing dishes, or doing laundry; (3) Robinson's low back pain made it difficult for her to sit or stand for long durations of time or walk for long distances; and (4) Robinson could walk for about 2.5 blocks at one time.[15]  The Court believes that failing to address these opinions draws into question the ALJ's RFC assessment and whether the ALJ's RFC is supported by substantial evidence.  *See Guilliams*, 393 F.3d at 803

Even more troubling to the Court is the ALJ's rationale for granting "little weight" to Dr. Anand's opinions:

> For disability determination purposes, [Robinson] was evaluated by a consultative examiner.  The doctor did not present any opinion on residual functional capacity or recommend any restrictions for [Robinson].  The report appears to have relied quite significantly on [Robinson's] subjective report of symptoms and medical history, along with a brief physical examination.  The undersigned therefore accords this opinion/evaluation little weight.

(Administrative Record at 7Y.)  The ALJ is simply incorrect that Dr. Anand "did not present any opinion on residual functional capacity or recommend any restrictions for [Robinson]."[16]  As the Court pointed out, Dr. Anand specifically opined that: (1) Robinson's seizure disorder and narcolepsy would make it difficult for her to drive; (2) Robinson's chronic neck pain would prevent her from doing activities that involve bending her head, such as typing, writing, climbing stairs, washing dishes, or doing

---

[14](...continued)
(Dr. Anand's Disability Evaluation).

[15] Administrative Record at 481-82.

[16] Administrative Record at 7Y.

laundry; (3) Robinson's low back pain made it difficult for her to sit or stand for long durations of time or walk for long distances; and (4) Robinson could walk for about 2.5 blocks at one time.[17] Clearly, Dr. Anand presented opinions on Robinson's RFC and functional restrictions.

Furthermore, the Court is unpersuaded that Dr. Anand's reliance on Robinson's "subjective report of symptoms and medical history" for the purposes of outlining Robinson's medical history is any reason — "clear," "good," or otherwise — for rejecting Dr. Anand's opinions. "A patient's report of complaints, or history, is an essential diagnostic tool" for any doctor when he or she is offering a medical opinion or diagnosis. *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997); *see also Brand v. Secretary of Dept. of Health, Ed. and Welfare*, 623 F.2d 523, 526 (8th Cir. 1980) ("Any medical diagnosis must necessarily rely upon the patient's history and subjective complaints."). Having reviewed the entire record, the Court concludes that the ALJ failed to properly evaluate and address Dr. Anand's opinions. *See Wagner*, 499 F.3d at 848. The ALJ's reasons for granting little weight to Dr. Anand's opinions are neither clear, nor supported by the record.

Most troubling to the Court is the ALJ's complete failure to follow the Court's directions on remand. On remand, the ALJ was directed to "provide clear reasons for accepting or rejecting Dr. Anand's opinions and support his reasons with evidence from the record, particularly with regard to Robinson's RFC."[18] The ALJ's decision is devoid of any clear reasons for rejecting Dr. Anand's opinions. Moreover, the ALJ's decision offers no support or evidence from the record for his reasoning. Finally, the ALJ's RFC determination lacks any consideration of Dr. Anand's opinions, even though Dr. Anand provided opinions on Robinson's functional abilities and limitations. By failing to address

---

[17] *Id.* at 481-82.

[18] Administrative Record at 707; *see also* docket number 20 at 17, in case number 6:08-cv-2012-JSS.

the concerns of this Court on remand, the ALJ not only wasted his time and the time of the Social Security Administration, but also wasted the time of the Court and, most importantly, the time of the claimant, who initially filed her application for SSI benefits in April 2004, nearly nine years ago.

The Court determines that remand is appropriate. Additionally, given the length of time since Robinson's application for SSI benefits was first filed, and the ALJ's repeated reluctance to consider Dr. Anand's opinions regarding Robinson's functional abilities and limitations, even though Dr. Anand offered such opinions, the Court believes that a new consultative examination is in order. *See Barrett*, 38 F.3d at 1023 (providing that a medical examination may be ordered when the medical records presented to an ALJ are insufficient for determining whether a claimant is disabled). Therefore, on remand, in addition to fully and fairly developing the record with regard to the opinions of Dr. Anand, the ALJ must also order a new consultative examination for Robinson.

### C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of

denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled).

In this case, the Court is presented with an unfortunate situation. The Court cannot say that the record in this matter overwhelmingly supports a finding of disability. Therefore, the Court must remand this matter for further development of the record with regard to the opinions of Dr. Anand. Such action is unfortunate because the Court has already remanded this matter once in 2009 for further development of the record with regard to the opinions of Dr. Anand. Given that Robinson filed her application for SSI benefits nearly nine years ago, the Court admonishes the ALJ to follow the Court's order on remand, and properly consider and evaluate Dr. Anand's opinions, providing clear and explicit reasons for accepting or rejecting Dr. Anand's opinions, and supporting those reasons with evidence from the record. While an ALJ is entitled to great deference, he or she is not entitled to blind deference; and the Court expects, at a minimum, that the ALJ will follow the Court's orders on remand and explain his or her reasoning when weighing the opinions of a treating or consultative doctor. The purpose behind the requirement for an ALJ to develop the record fully and fairly is so that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)). The Court implores the ALJ to meet this requirement on remand.

## *VI. CONCLUSION*

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ must properly consider and evaluate Dr. Anand's opinions, providing clear and explicit reasons for accepting or rejecting Dr. Anand's opinions, and supporting those reasons with evidence from the record. The ALJ must also order a new consultative examination for Robinson.

## VII.  ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this _31st_ day of ___January___, 2013.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA